UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SIMON A. MAHANNA and<br>DEBRA ANN MAHANNA,<br><br>    Plaintiff(s),<br><br>vs.<br><br>U.S. BANK NATIONAL ASSOCIATION,<br><br>    Defendant(s). | Case No. 4:11CV308 JCH |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant U.S. Bank National Association's Motion for Summary Judgment, filed March 20, 2012. (ECF No. 22). The motion is fully briefed and ready for disposition.

**BACKGROUND**

On or about September 10, 1986, Plaintiffs Simon A. and Debra Ann Mahanna executed a Promissory Note with Mark Twain Bank, N.A., in which Plaintiffs promised to pay a maximum principal amount of $8,000, if borrowed under the Note[1], for the purpose of a personal line of credit.[2] (Plaintiffs' Response to Defendant U.S. Bank's Statement of Uncontroverted Material Facts ("Plaintiffs' Response to Defendant's Facts"), ¶ 1, citing Plaintiffs' Exh. 1). The Note had a maturity date of March 10, 1987, and as security for the Note Plaintiffs pledged "Gold Medals." (Id.). Plaintiffs physically delivered the Gold Medals to the Progress branch of Mark Twain Bank in

---

[1] Plaintiffs maintain they received no principal sum at the time of execution of the Note. (Plaintiffs' Response to Defendant's Facts, ¶ 2).

[2] The Promissory Note indicated that the agreement was for "Open End Credit," meaning Plaintiffs were entitled to borrow up to the maximum amount of principal more than one time. (Plaintiffs' Exh. 1, P. 1).

September, 1986, and Plaintiff Simon Mahanna asserts he was told by a representative of Mark Twain Bank, Mr. Dennis Geohegan, that the collateral would physically be kept in a safe deposit box at that branch. (Id., ¶¶ 2, 3, citing Plaintiffs' Exh. 6, S. Mahanna Dep., P. 17).

On or about May 1, 1987, Plaintiffs entered into an Execuline Account Agreement with Mark Twain Bank, Account No. 8100064599. (Plaintiffs' Response to Defendant's Facts, ¶ 4, citing Plaintiffs' Exh. 2). The Execuline Agreement listed as collateral "Various Gold Medals and Proof Sets," and a detailed description of the collateral was included in a Security and Pledge Agreement executed by Plaintiffs simultaneously with the Execuline Agreement.[3] (Id., citing Plaintiffs' Exh. 3).

On or about January 18, 1990, Plaintiff Debra Mahanna entered into another Execuline Account Agreement with Mark Twain Bank, Account No. 8100074381. (Plaintiffs' Response to Defendant's Facts, ¶ 5, citing Plaintiffs' Exh. 4). This Execuline Agreement increased the available credit line from $8,000 to $80,000. (Id.). As security for the increase in the credit limit, Plaintiff Debra Mahanna executed a Consumer Assignment of Certificate of Deposit, which pledged three Certificates of Deposit totaling $72,000. (Id., citing Plaintiffs' Exh. 5). Plaintiffs maintain the gold medals and proof sets continued to be held as collateral for the initial $8,000 line of credit, as well as for all other obligations of Plaintiffs to Mark Twain Bank, including the January 18, 1990, Execuline Account Agreement. (Id., citing S. Mahanna Dep., P. 42, Plaintiffs' Exh. 4).

In mid-1997, Plaintiffs received notice through the mail of the merger between Mark Twain Bank and Mercantile Bank, and the impending closure of Mark Twain Bank's Progress branch.[4]

---

[3] The collateral was described as follows: 11 medals--1 oz. Grant Wood Gold Medal 1980; 20 medals--.50 oz. Willa Cather Gold Medal 1981; 19 medals--1 oz. Mark Twain Gold Medal 1981; 11 medals .50 oz. Marian Anderson Gold Medal 1980; and 10--American Coin Proof Sets. (See Plaintiffs' Exh. 3, P. 1).

[4] According to Plaintiffs, by later merger or purchase transactions Firstar Bank became the successor in interest to Mercantile Bank, and Defendant U.S. Bank became the successor in

(Defendant U.S. Bank's Statement of Uncontroverted Material Facts ("Defendant's Facts"), ¶ 6, citing Defendant's Exh. A, S. Mahanna Dep., P. 20, Defendant's Exh. D, Deno Aff., ¶ 6). Plaintiffs maintain they further received notice that their collateral, "was being moved from Progress because Progress was being shut down." (Plaintiffs' Response to Defendant's Facts, ¶ 6, quoting S. Mahanna Dep., P. 20). Shortly after receiving this notice, Plaintiff Simon Mahanna began, "trying to reclaim the collateral." (Id., ¶ 7, quoting S. Mahanna Dep., P. 20).[5] Plaintiff Simon Mahanna met with Mr. Rich Ross of the Private Banking Group in 1997, and was advised Mr. Ross did not know the whereabouts of the collateral and would have to "research what he could about it." (Defendant's Facts, ¶ 9 and Plaintiffs' Response thereto; S. Mahanna Dep., PP. 20-21). Plaintiff Simon Mahanna admits he inquired several times between 1997 and 2010 as to the location of the collateral, and at no time was the bank able to locate the gold medals and proof sets. (Defendants' Facts, ¶ 10, citing S. Mahanna Dep., PP. 23-33).

On July 12, 2010, Plaintiffs' counsel mailed a letter to Mr. David Brody, Vice President of the Private Client Reserve at U.S. Bank, requesting the return of the collateral on behalf of Plaintiffs. (Defendant's Facts, ¶ 11, citing Defendant's Exh. C, Deno Dep., P. 60). Defendant's District Operations Manager, Ms. Kathy Deno, testified that at that time bank representatives, "worked through our system in trying to locate documents that might help lead to what might have occurred,

---

interest to Firstar Bank. (Petition (hereinafter "Complaint"), ¶ 9).

[5] Plaintiffs attempt to distinguish between their characterization of Simon Mahanna's efforts to reclaim the collateral, and Defendant's assertion that he "demanded the return of the collateral." (See Defendant's Facts, ¶ 7 and Plaintiffs' Response thereto). Upon consideration, the Court finds this to be a distinction without a difference.

were unsuccessful..." (Plaintiffs' Response to Defendant's Facts, ¶ 12, quoting Plaintiffs' Exh. 9, Deno Dep., P. 60).[6]

On October 26, 2010, Mr. Stephen R. Mullin, Senior Vice President/Market Leader of Defendant's Private Client Reserve, forwarded a letter to Plaintiffs' counsel, stating in relevant part as follows:

> Following Mr. Brody's [now a former employee of Defendant's] receipt of your letter, this issue was researched thoroughly within appropriate departments at U.S. Bank. As a result of that search, we have concluded that such collateral is not held at U.S. Bank. It does appear that some property of Mr. Mahanna escheated to the State of Missouri, as reflected on a search of the National Association of Unclaimed Property Administrators website....We have advised Mr. Mahanna of this in the past, and suggest that he now contact the proper authorities to retrieve the escheated items.[7]

(Plaintiffs' Exh. 10).

On or about January 14, 2011, Plaintiffs filed their Complaint against Defendant in the Circuit Court of St. Louis County, Missouri. (Notice of Removal, ECF No. 1, ¶ 1). Defendant removed Plaintiffs' Complaint to this Court on February 18, 2011. (Id.). Count I of Plaintiffs' Complaint asserts Breach of Contract, as Defendant allegedly has failed and refused to return the collateral to Plaintiffs. Count II asserts Conversion, as Defendant allegedly intentionally has failed to return such collateral, and has converted the collateral to its own use and benefit. Count III asserts Negligence, as among other things, Defendant allegedly negligently failed to secure and safeguard the collateral

---

[6] Defendant has a corporate records retention policy by which it does not retain records longer than seven years. (Defendant's Facts, ¶ 13, citing Deno Dep., P. 16). With respect to a line of credit, however, the bank keeps the account agreement itself (as long as it is open), together with the most current seven years of documents. (Deno Dep., PP. 17-18).

[7] Plaintiffs maintain the collateral should not have escheated to the State, as Plaintiffs never abandoned the collateral in any manner. (Plaintiffs' Response to Defendant's Facts, ¶ 14).

from loss, destruction, misdelivery or misappropriation, and negligently failed to insure delivery of the collateral to Plaintiffs.

As stated above, Defendant filed the instant Motion for Summary Judgment on March 20, 2012, asserting Plaintiffs' claims are barred either by the applicable statute of limitations, or by the doctrine of laches. (ECF No. 22).

## **SUMMARY JUDGMENT STANDARD**

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson,

477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

## **DISCUSSION**

In its Motion for Summary Judgment, Defendant first asserts Plaintiffs' claims are barred by the applicable statute of limitations. In order to assess whether the claims are time-barred, the Court first must determine when the causes of action accrued. Under Missouri law[8], "[t]he mere occurrence of an injury itself does not automatically correspond with the accrual of a cause of action." Warren County Concrete, L.L.C. v. Peoples Bank & Trust Co., 340 S.W.3d 289, 291 (Mo. App. 2011) (citation omitted). Instead, "a cause of action under the limitation set forth in section 516.120[9] accrues not 'when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment.'" Id. (quoting Mo.Rev.Stat. § 516.100).

"'[T]he capable of ascertainment test is an objective one.'" McClain ex rel. Rutledge v. Carpio, 338 S.W.3d 361, 373 (Mo. App. 2011) (quoting Powel v. Chaminade Coll. Preparatory, Inc., 197 S.W.3d 576, 584 (Mo. banc 2006)).[10]

> The issue is not when the injury occurred or when the plaintiff subjectively learned of the wrongful conduct. Damage is capable of ascertainment when a reasonable person would have been put on notice that an injury and

---

[8] The parties agree that Missouri law governs this diversity action.

[9] While Plaintiffs acknowledge the statute of limitations for their conversion and negligence claims is five years, they assert the breach of contract claim is subject to a ten year statute of limitations under Mo.Rev.Stat. § 516.110. (Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, PP. 7-10). For purposes of this Order only, the Court accepts Plaintiffs' contention as to the applicable statute of limitations for their breach of contract claim.

[10] "Because the capable of ascertainment standard is an objective one, where relevant facts are uncontested, the statute of limitations issue can be decided by the court as a matter of law." Powel, 197 S.W.3d at 585.

> substantial damages may have occurred and would have undertaken to ascertain the extent of the damages. In other words, the statute of limitations begins to run when the evidence was such to place a reasonably prudent person on notice of a potentially actionable injury.

Id. (internal quotation marks and citations omitted).[11] Further, "[s]ection 516.100's phrase 'capable of ascertainment' refers to the fact of damage but does not mandate the plaintiff know the precise amount of that damage." State ex rel. Gasconade County v. Jost, 291 S.W.3d 800, 804 (Mo. App. 2009) (citation omitted). See also Gaydos v. Imhoff, 245 S.W.3d 303, 307 (Mo. App. 2008) (internal citations omitted) ("[A]ll possible damages need not be known, or even knowable, before the statute accrues. In order for the statute to accrue, plaintiff must have knowledge of the wrong and at least nominal damage, or of something that puts plaintiff on notice to inquire further.").

Upon consideration, the Court concludes the statute of limitations has run on Plaintiffs' claims. As noted above, Plaintiff Simon Mahanna testified that he started "trying to reclaim the collateral" when he received notice it was being moved due to the closing of the Progress Bank branch. (S. Mahanna Dep., P. 20). While he was not sure the exact date, Mr. Mahanna testified that he received such notice sometime in 1997. (Id.). Mr. Mahanna's deposition testimony continued as follows:

| Q (by Ms. Felicia Williams) | So you actually went in and met with Richard [Ross, of the Private Banking Group]. Tell me as much as you can remember about that meeting. Did he tell you at that time yes, we still have the collateral here? |
|---|---|
| A (by Simon Mahanna) | He didn't know, he didn't know. He had to research what he could about it. |

---

[11] This principle represents a "middle of the road" test. Carr v. Anding, 793 S.W.2d 148, 150 (Mo. App. 1990). Missouri courts have rejected both the more restrictive "occurrence rule," "which holds that the moment the [wrong] is committed, the statute begins to run," and the broader "discovery rule," "which states that the statute of limitations begins to run when the injury or damage is actually discovered." Id. (citations omitted).

> Q   Did you ever hear back from him after his research?
>
> A   We used to touch base on a periodic basis. He was running into a problem because of how things were moved around, people were moved. There was issues of trying to locate how they moved the boxes and the collateral and everything is what I recall.
>
> Q   So Rich Ross, was he ever able to tell you conclusively this is where the collateral is?
>
> A   No, he retired in 2002, 2003, because private banking was separate. It was an issue of getting people to do work.
>
> Q   Making sure I have this straight, to your knowledge you went in and talked to Rich Ross in 1996, 1997, somewhere around there?
>
> A   Probably '97, '98....
>
> Q   So between 1997, 1998 and Rich's retirement in 2002, 2003, how many times would you say you went to the branch requesting information on the collateral?
>
> A   A number. If you said once a month, that might have been on the light side, just trying to follow-up.

(S. Mahanna Dep., PP. 21-22).

In light of these circumstances, while the Court declines to pin-point precisely when Plaintiffs' claims for damages were capable of ascertainment, it finds they certainly were capable of being ascertained long before January 14, 2001[12]--the earliest date the claims could have been ascertained and still be within the statute of limitations. See Carr, 793 S.W.2d at 150. Plaintiffs' claims thus are barred by the statute of limitations.[13]

## **CONCLUSION**

---

[12] Allowing Plaintiffs the benefit of the doubt as to the applicable statute of limitations, this date represents ten years prior to the date on which they originally filed suit.

[13] In light of the above ruling, the Court need not address Defendant's assertion Plaintiffs' claims are barred by the doctrine of laches.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant U.S. Bank's Motion for Summary Judgment (ECF No. 22) is **GRANTED**, and Plaintiffs' claims are **DISMISSED** with prejudice. An appropriate Judgment will accompany this Memorandum and Order.

Dated this 13th day of June, 2012.

/s/Jean C. Hamilton
UNITED STATES DISTRICT JUDGE